VAN BRUNT, P. J.
—This action was brought by the plaintiff for the benefit of the next of kin of Nathan Goldschmidt1, deceased, to recover damages for injuries resulting in the death of said Nathan Goldschmidt, alleged to have been caused by deceased being run over by one of the cars of*the defendant on Delancey street, in the city of New York, near- the intersection of that street with Allen street. Upon the trial of the action, evidence was given upon the part of the plaintiff tending to show negligence of the defendant, and, in behalf of the defendant, evidence tending to show that the accident happened in a manner entirely different from that in which it -was claimed to have oc *639 curred by the witnesses of the plaintiff. At the close of the plaintiff’s case, and after all the testimony had been taken, a, motion was made to dismiss the complaint, upon the ground, among others, that no negligence upon the part of the driver of the defendant’s car had been shown. These questions having been submitted to the jury, a motion was made upon the minutes for anew trial; and from the judgment thereupon entered, and from the order denying the motion for a new trial, this appeal is taken.
Upon an examination of the testimony in this action, it will be seen that the witnesses for the plaintiff testified, in the first place, to an improbable story, and, in the next place, contradicted themselves and each other in many of the essential points of the case; while, upon the part of the defendant, witnesses, the most of whom are clearly entitled to credit, unconnected with the road, testified to a consistent state of facts, which showed that the driver of the car in question was not guilty of any negligence in reference to the happening of the accident.
Four witnesses were examined upon the part of the plaintiff,—Jacobs, Kaloher, Goldman, and Rayrnann. Jacobs starts out with a statement in regard to the direction in which the child was going, wherein he contradicts all the other witnesses who were examined in the case. He states that the child was going from the south side of the street to the north side, whereas all the other witnesses agree that the child was going in the opposite direction. This witness also testified that the car was going at full speed,, and that it did not slow up for any Second avenue car; that he-did not see any Second avenue car there; that it was going eight miles an hour, and then that it was going eight or five or three miles an hour; he could not tell for sure. He also stated that he saw the child when the car was thirty or thirty-five feet away, crossing the south track, and the first horse knocked down the child, and he fell down, and the first outside wheel ran over his-head, and the body was lying outside the track, and the head was lying inside the track. Thus, according to his story, the-child, before it was run over, must have been knocked completely across the track. This witness states that he was upon the front platform, and that he could not tell whether there were any more persons on the platform or not; and, in another place, that the first that he knew about it was when he felt the jumping of the car as it ran over the head of the child. He also states that, after running over the child, the driver of the car drove to the other side of the street, and then ran away, which upon his own confession, and upon the other direct proof in the case, was absolutely false, and nothing but an invention of his own. The next witness upon the part of the plaintiff was a man named Kalcher. He claimed that he saw the child run over upon the day in question ; that it was around upon time, and that the car was going west; that the child was run over at the northeast corner of Delancey and Allen streets ; that, when he saw the child, it was in the act of coming down the street, between the gutter and the track, which ispace amounted *640 to about four feet; that the child was coming from the north, and going south; and that, when he first saw the child in that position, the heads of the horses attached to the car that ran over the child were about thirty feet away; that he did not see the child knocked down; that he first saw the child lying on the track; its head was lying on-the track ; the head of the child was lying on the rail nearest the north side of the street. The witness further testified that he did not notice the child knocked down ; that the first he saw was the child lying with its head between the two wheels of the ear, and that he saw the hind wheel going over it. The witness upon direct examination, testified that the car was going very fast, seven or eight miles an hour. But, upon cross-examination he testified that he saw the Second avenue' car there, and that the car which ran over the child slowed up for the Second avenue car to pass, coming nearly tó a walk. The next witness examined upon the part of the plaintiff was a peddler, named Goldman. He testified that he was going north on Allen street, and saw the child, who. was coming in an opposite direction ; that he heard a scream, and saw the' child standing on the track; that at this time the horses’ heads were away from the child about the third house from the corner; that the car was going fast, and, when the child screamed, the witness ran, but the child was already run over ; that the people were shrieking out before the child was touched by the horses or the car; that he did not notice whether the driver did anything to stop the speed of his horses1; and that the car did not stop after running over the child until it got to the other side of the street. He further testified that he screamed to the driver; that the driver was holding the horses, but the horses were running; and that the driver did nothing at all when he called to him ; and that the driver’s face was turned towards the people on the platform, there being four or five of them, and he was talking to them. The next witness examined upon the part of the plaintiff was a man by the name of Eaymann. He stated that he saw the child before it was knocked down, crossing the street; and that, when it got on the rail crossing the track, the heads of the horses were from thirty to thirty-five feet away, and the driver was going at a fast rate, much faster than cars usually go; and that he did not see any Second avenue car there. When asked, “How far from the corner of "Allen were you when you first saw the child ?” he answered: “ The car had passed there. I just seen where the horses struck the child.” It is to be observed that the child was run over before the car had crossed Allen street. The witness repeats: This car that I have reference to, this company’s car, bad just passed me. It had crossed Allen street then. It j ust struck the child when I seen it. The car was going the same direction I was going.” This witness admitted that on the 19th of October, a few days after the accident, he had made a statement that he did not see how the boy could get under the wheel, and did not know whether he was knocked down or fell under the wheel;, that he did not see him under the car; that he was looking south at the time ; and that, the first that he saw, the boy was in front of the rear wheel *641 of the can Upon being interrogated in regard to this statement, he said that he made the statement to the man who questioned him merely to please him ; that he did not always tell the truth, 'but only told it when he was under oath ; that he had told two opposite stories in the case, and one of them was false. He says : “I told the false story because I told him what I thought about it." The witness further said in answer to the question, “What was your object in telling a story about it?” “Well, I knew the company wanted to beat the case, and I stuck to the poor man. I am a working man myself. That is why I changed it."
Upon the part of the defendant, the driver of the car was examined, and he testified that he was crossing Allen street when the police officer, who was also examined as a witness, raised his hand, and told him to stop, that there was somebody run over. The driver testified that he felt a jar in running over the child, but did not see him at all until he went back and that there was no one upon the front platform with him. He further testified that the car was not going fast, but had slowed .up fifteen or twenty feet from the crossing to let a Second avenue car pass. Another witness was called upon the part of the defendant, named Lee. He testified that the boy was going down Allen street towards Eivington,—crossing towards Broome; that the car which ran over the boy came almost to a full stop to let the Second avenue oar pass ; and that, just as the car started, the hoy ran to the curb, stepped down, and then fell under the wheels of the car, only the hind wheel of the car going over his head, A lady by the name of Mrs. Barclay, who was a passenger on the car, was also examined as a witness for the- defendant. She testified that the car was not going fast, but, on the contrary, that it was going very slowly; that it had slowed up to let the Second avenue car pass, and that the first she knew about the accident was a thud ; that she thought the wheel went over a stone ; that there was only one thud, and it was at the hind wheel, just on the side of her, the witness having testified that she sat forward of the hind wheel. The witness further testified that, after she heard this thud in the ° rear of the car, she stood up with the rest, and then saw the boy lying on the track, with his head facing the car; that at this time the whole of the car had passed away from where the boy was lying. The next witness examined upon the part of the defendant was a passenger named Whitworth, who was an indexer in the Equitable Gaslight Company. He hoarded the-car at Pitt and Delancey streets, and was sitting in the corner, engaged in counting up the indexes in his book. He noticed that the car, on coming near Allen street, was going slowly, ■which annoyed him, on account of his wanting to make up time to get his lunch aud get back to the office. He testified that the first he knew of the accident was that he felt a jolt of the car, and the book in his lap fell upon the floor ; that he got up to see the cause of the jolt, and, looking back on the track, he saw a bundle, and, on looking move closely, he saw it was a child, by seeing the feet. He further testified that he could locate that jolt; *642 that there was one distinct jolt, and only one ; that he was sitting in the rear of the car, and the jolt was in the rear of the car; and that the accident occurred between 12:30 and 1 o’clock. A policeman named McArdle was also examined, and testified that he was in the neighborhood of Allen and Delancey streets at the time of the accident; that he saw the Delancey street car, which was proceeding slowly; and that the Second avenue car passed in front of it. While the witness was waiting for the car, he spoke to the witness Lee, whom he knew; that, as the car was abreast of him, he caught hold of the railing, and stepped on the front platform, and said: “ Driver, hold up ;• you have run over a child.” “ He said: ‘ No, sir.’ I said: ‘ Yes; stop.’ ” The driver then got off the car, and went with the policeman towards where the child was. The witness further testified that there was nobody on the front platform at any time since he saw the car, and he saw the car before the happening of the accident. He further testified that he did not see the boy until he had been run over.
Upon a consideration of this testimony, it is evident that there was an attempt upon the part of the witnesses for the plaintiff to make it appear that the car was going at a high rate of speed, when it is manifest from their own cross-examination, and from, the testimony of one of their number, besides that of the witnesses upon the part of the defendant, that the car was not going fast, but was going slowly, having slowed up in order to let the Second avenue car pass. We further find, upon considering the testimony of the plaintiff’s witnesses, that they told stories which are not consistent with each other, and which in some of their features present physical impossibilities. There does not seem to be any point in respect to the method of the happening of this accident in which they agree. One states that he was alone upon the front platform, and another that he saw five or six people on the front platform, to whom the driver was talking; and each witness testified in some part of his examination that the first thing he knew about the accident was when the child was lying between the .wheels of the car, which was probably the truth. The evidence of the witnesses upon the part of the defendant, on the contrary, is entirely harmonious and consistent with the theory of the accident as developed by the testimony. The witnesses are consistent in their statement. They are not contradicted, either by themselves or by any of the other witnesses, in any essential particular. It is manifest that the witness Jacobs was willing to swear to anything which would tend to establish a liability upon the part of the defendant. He deliberately swore that, after the child was run over, he saw the car driver stop the car, and run away. This he reiterates, and is then compelled to admit that he did not see him do anything of.the kind. This witness further places the child in such a position that it was a physical impossibility for the accident to have happened in the manner described by him. Taking into consideration all these facts, it seems to us that there was no credible testimony upon the part of the plaintiff which would justify the submission of the question of the negligence of the defendant to the jury. Each and every witness of the plaintiff is impeached *643 by himself, and, in addition, is shown to have testified falsely by the facts established upon overwhelming evidence.
Upon the whole case, we are of the opinion that the judgment should be reversed, and a new trial ordered, with costs to the appellant to abide the event.
All concur.